IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

STEPHEN W. BRISCOE;
CONTINUUM HEALTH PARTNERSHIPS, INC.;
CONTINUUM HEALTH MANAGEMENT, LLC; and
MOUNTAIN STATES HEALTH PROPERTIES, LLC,

      Plaintiffs,

v.

KATHLEEN SEBELIUS, in her official capacity as
Secretary of the United States Department of Health
and Human Services; SETH D. HARRIS, in his official capacity
as Acting Secretary of the United States Department of Labor;
NEAL WOLIN, in his official capacity as Acting Secretary
of the United States Department of the Treasury; UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; UNITED STATES DEPARTMENT OF LABOR;
and UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

---

## VERIFIED COMPLAINT

---

PLAINTIFFS STEPHEN W. BRISCOE, CONTINUUM HEALTH PARTNERSHIPS,
INC., CONTINUUM HEALTH MANAGEMENT, LLC, and MOUNTAIN STATES HEALTH
PROPERTIES, LLC, by and through their attorneys Michael J. Norton of Alliance Defending
Freedom and Natalie L. Decker of the Law Office Of Natalie L. Decker, LLC, for their
complaint against the Defendants above-named, state and allege as follows:

## **NATURE OF THE CASE**

1.  This case is about religious freedom.  In this action, Plaintiffs seek declaratory and injunctive
    relief for the Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C. §

2000bb *et seq.* (hereinafter "RFRA"), the First and Fifth Amendments to the United States

Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (hereinafter

"APA") caused by the actions of the Defendants in implementing the Patient Protection and

Affordable Care Act (Pub. L. 111-148, March 23, 2010, 124 Stat. 1029) and the Health Care

and Education Reconciliation Act (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029)

(collectively known and hereinafter referred to as "PPACA"), in ways that force Plaintiffs

and thousands of other individuals to violate their deepest held religious beliefs.

2. Plaintiff Stephen W. Briscoe is a believing and practicing Evangelical Christian.  Mr. Briscoe

owns, directly or indirectly, several separate Colorado limited liability companies or

Colorado for-profit corporations, organized as such for liability purposes, which, in turn, own

and operate several senior independent living residences, assisted living centers or skilled

nursing facilities and related businesses which manage such centers or facilities.  All of the

Colorado for-profit corporations are S Corporations.  Mr. Briscoe's businesses (sometimes

referred to herein as "Mr. Briscoe's Businesses") collectively employ in excess of 200 full-

time employees.

3. Mr. Briscoe's Businesses provide health insurance for the employees of his businesses

pursuant to a self-insurance plan which renews each year on April 1.  Thus, the next renewal

date for such plan is April 1, 2013.  Negotiations for the renewal plan are now underway and

must be finalized by February 15, 2013 at the latest in order for the plan to be in place

effective on and after April 1, 2013.

4. Mr. Briscoe sincerely holds religious beliefs that God mandates respect for the sanctity of

each human life and that abortion and abortion-inducing drugs result in the wrongful taking

of a human life.  Mr. Briscoe seeks to run his businesses in accord with his sincerely held religious beliefs.

5. On February 15, 2012, the Defendants issued final rules through the Departments of HHS, Labor, and Treasury entitled "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act," 77 Fed. Reg. 8725-30 that forces Plaintiffs to pay for and otherwise facilitate the insurance coverage and use of abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling.

6. With significant exceptions, all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage must provide coverage for certain preventive services without cost-sharing.  42 U.S.C. § 300gg-13.  These services have been defined by the Health Resources and Services Administration ("HRSA") to include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity."  HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/ (referred to hereinafter the "HHS Mandate").

7. In the category of "FDA-approved contraceptives" included in this HHS Mandate are several drugs or devices that may cause the demise of an already-conceived but not-yet- implanted human embryo, such as "emergency contraception" or "Plan B" drugs (the so-called "morning after" pill) and "ella" (the so-called "week after" pill) which studies show can function to kill embryos even after they have implanted in the uterus, by a mechanism similar to the abortion drug RU-486.

8.  Over the last several months, Mr. Briscoe has become aware that many citizens of the United States of America hold the same or similar religious beliefs as does Mr. Briscoe and have, as a result, challenged the application of the HHS Mandate to them and to their businesses.

9.  As the controversy surrounding the HHS Mandate arose, Mr. Briscoe discovered in about January 2013 that his businesses' self-insurance plan covered "FDA-approved contraceptives."  Mr. Briscoe learned that FDA-approved contraceptives included Plan B drugs and ella, drugs that are, in fact, abortifacients.

10. Mr. Briscoe has instructed the company that provides his businesses with insurance not to cover such abortifacients.  He has been informed that, without relief from this Court, the company may not provide such insurance and must provide coverage compliant with the HHS Mandate.

11. Thus, the HHS Mandate illegally and unconstitutionally coerces Mr. Briscoe and his businesses to violate his sincerely held religious beliefs under threat of heavy fines and penalties.  The HHS Mandate also forces Mr. Briscoe and his businesses to fund government-dictated speech that is directly at odds with the religious ethics derived from his deeply held religious beliefs that he strives to embody in his businesses.

12. Defendants' refusal to accommodate the religious and conscience objections of Mr. Briscoe and his businesses is highly selective. The PPACA exempts a variety of health plans from the HHS Mandate and, upon information and belief, the Defendants and other government officials have provided thousands of exemptions or waivers from the PPACA for various

other entities, such as large corporations.[1] But Defendants' HHS Mandate does not exempt Plaintiffs' employee health insurance plan or those of many other religious Americans.

13. Defendants' actions violate Plaintiffs' right freely to exercise religion protected by the RFRA and the Religion Clauses of the First Amendment to the United States Constitution.

14. Defendants' actions also violate Plaintiffs' right to the freedom of speech as secured by the Free Speech Clause of the First Amendment to the United States Constitution and their due process rights secured by the Fifth Amendment to the United States Constitution.

15. Additionally, Defendants violated the Administrative Procedure Act, 5 U.S.C. § 553, by imposing the HHS Mandate without prior notice or public comment, and for other reasons.

16. Plaintiffs are now faced with imminent harm due to Defendants' HHS Mandate.  The HHS Mandate by its terms forces Plaintiffs to obtain and pay for insurance coverage of the objectionable items in their April 1, 2013 employee health insurance plan.

17. Absent injunctive relief from this Court on or before February 15, 2013, by virtue of the number of full-time employees employed by Plaintiffs, Plaintiffs must either comply with the HHS Mandate or be illegally and unconstitutionally coerced into violating sincerely held religious beliefs under threat of heavy fines and penalties.

18. The HHS Mandate would force Plaintiffs to fund government-dictated speech concerning education and counseling related to abortion-inducing contraception drugs and abortifacient drugs that is directly at odds with Plaintiffs' deeply held religious beliefs and the moral ethics Plaintiffs strive to embody in their businesses.

19. Defendants' coercion tramples on the freedom of conscience of Plaintiffs and of millions of other Americans who seek to abide by their religious convictions, to comply with moral

---

[1] One Court has estimated that "191 million Americans belong to plans which may be grandfathered under the ACA." *Newland v. Sebelius,* 2012 U.S. Dist. LEXIS 104835 at *4 (D. Colo. July 27, 2012); accord *Tyndale House Publ'rs. V. Sebelius,* 2012 U.S. Dist. LEXIS 163965 at *57-61 (D.D.C. Nov 16, 2012).

imperatives decreed by God Himself in His Holy Bible, and to participate in the public square through their businesses in a way that is consistent with their deeply held religious beliefs, and the ethical imperatives decreed by God Himself.

20. Defendants' refusal to accommodate Plaintiffs' sincerely held religious beliefs is highly selective.  PPACA exempts a wide variety of employee health insurance plans from the HHS Mandate and, upon information and belief, the federal government has provided thousands of exemptions from PPACA and the HHS Mandate for various entities, including large corporations and others.  However, Defendants' HHS Mandate does not exempt Plaintiffs' employee health insurance plan or the health insurance plans of thousands of other religious American citizens and their businesses.

21. Defendants' actions violate Plaintiffs' right to freely exercise their religion, rights protected by the Religion Clauses of the First Amendment to the United States Constitution, rights secured by the Free Speech Clause of the First Amendment to the United States Constitution, due process rights secured by the Fifth Amendment to the United States Constitution, and rights protected by the Religious Freedom Restoration Act.

22. Additionally, Defendants' actions have violated the Administrative Procedure Act, 5 U.S.C. § 553, by imposing the HHS Mandate on Plaintiffs and other Americans without prior notice or public comment, and for other reasons alleged herein.

23. Plaintiffs are faced with immediate, imminent and irreparable harm due to Defendants' HHS Mandate which, by its terms, forces Plaintiffs to obtain and pay for insurance coverage for objectionable abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling in their employee health insurance plan.  Plaintiffs provide employee health insurance through a company-owned self-insurance plan which must be

renewed on or by April 1, 2013.  To effectuate Plaintiffs' company-owned self-insurance plan on or by April 1, 2013, Plaintiffs must negotiate, coordinate, and arrange the details for that company-owned self-insurance plan by February 15, 2013 at the latest.

24. Plaintiffs therefore will suffer irreparable harm by or before February 15, 2013 unless this Court enters declaratory and injunctive relief to protect Plaintiffs from Defendants' deliberate attack on Plaintiffs' consciences, religious freedoms, and speech freedoms which would result from forced compliance with the HHS Mandate.

## **PARTIES**

25. Plaintiff Stephen W. Briscoe (hereafter "Mr. Briscoe") is an individual and resident of Greeley, CO.  Mr. Briscoe indirectly owns several senior independent living residences, assisted living centers or skilled nursing facilities and related service and support entities. Each of the senior independent living residences, assisted living centers or skilled nursing facilities, as well as related service and support entities, are, for liability reasons, owned by separate Colorado limited liability companies or Colorado for-profit corporations.  Attached hereto as Exhibit A is a diagram of the organizational structure of Mr. Briscoe's Businesses each of which is described in more detail below.  By virtue of his ownership of these entities, Mr. Briscoe is solely responsible for implementing compliance with the HHS Mandate.

26. Plaintiff Continuum Health Partnerships, Inc. is a Colorado corporation resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "CHP").  Mr. Briscoe owns 100 percent of the stock of CHP.  CHP is the sole member, *i.e.*, owner, of:

    a.  CH-Denver, II, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "CH-Denver"), which is an oxygen supply company which services the various the senior independent living residences, assisted

living centers or skilled nursing facilities owned and operated by Mr. Briscoe's Businesses.  Mr. Briscoe is the manager of CH-Denver.

b.  Connessione Investments, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Connessione Investments"), which is an investment company.  Mr. Briscoe is the manager of Connessione Investments.

c.  Continuum at Pueblo, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Pueblo"), which owns independent living homes for seniors in Pueblo, CO.  Mr. Briscoe is the manager of Continuum Pueblo.

d.  Continuum at Spring Ridge Park, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Spring Ridge Park"), which owns a senior assisted living center in Wheat Ridge, CO.  Mr. Briscoe is the manager of Continuum Spring Ridge Park.

e.  Continuum at Chateau, Inc., is a Colorado corporation resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Chateau"), provides senior assisted living services in Pueblo, CO.  Mr. Briscoe is the president of Continuum Chateau.

f.  Continuum at Sharmar, Inc., is a Colorado corporation resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Sharmar"), which provides skilled nursing services for seniors in Pueblo, CO.  Mr. Briscoe is the president of Continuum Sharmar.

g.  Continuum at Foxhill Meadows, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Foxhill"), which

owns undeveloped land in Fort Collins, CO.  CHP is the member (owner) of Continuum Foxhill.  Mr. Briscoe is the manager of Continuum Foxhill.

h.  Continuum at Abriendo, Inc. ., is a Colorado corporation resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "Continuum Abriendo"), which owns the land and improvements leased to Continuum Sharmar and Continuum Chateau in Pueblo, CO.  CHP is the sole stockholder of Continuum at Abriendo.  Mr. Briscoe is the president of Continuum Abriendo.

27. Plaintiff Mountain States Health Properties, LLC is a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "MSH").  Mr. Briscoe is the sole member, *i.e.,* owner, of MSH.  Mr. Briscoe is also the manager of MSH.  MSH, in turn, owns WGCC, LLC, a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "WGCC").  WGCC, which is managed by Mr. Briscoe, in turn, owns an independent living residence, senior assisted living center and skilled nursing facility.

28. Plaintiff Continuum Health Management, LLC is a Colorado limited liability company resident at 1990 5[9th] Avenue, Greeley, CO 80633 (hereafter "CHM").  CHP is the sole member, *i.e.,* owner of CHM.  Mr. Briscoe is the manager of CHM.  CHM, pursuant to management agreements with the owner of each senior independent living residence, assisted living center or skilled nursing facility, provides daily management to the senior independent living residences, assisted living centers or skilled nursing facilities operated by Continuum Pueblo, Continuum Spring Ridge Park, Continuum Chateau, Continuum Sharmar, and/or WGCC. Management is provided for the assets of Continuum Foxhill and Continuum Abriendo.

29. In addition, CHM is the member (owner) and manager of CH-Greeley, LLC, a Colorado limited liability company resident at 1990 59th Avenue, Greeley, CO 80633 (hereafter "CH-Greeley"), which operates the Continuum office in Greeley, CO.

30. Mr. Briscoe's Businesses, including CHP, MSH, and CHM and related entities Mr. Briscoe owns, directly or indirectly, are self-insured pursuant to a single healthcare insurance plan which is held by CHM.  As the current healthcare insurance plan ends on March 31, 2013, the new healthcare insurance plan, which must be negotiated and under contract by no later than February 15, 2013 so as to provide appropriate notices, including the summary of benefits, to employees by March 1, 2013 for the plan that is to take effect on and after April 1, 2013.

31. Absent an order of this Court, Mr. Briscoe and Mr. Briscoe's Businesses, on and after March 1, 2013 will be required to contract for and implement compliance with the HHS Mandate for all employees of Mr. Briscoe's Businesses.

32. Defendants are appointed officials of the United States government and United States Executive Branch agencies responsible for issuing and enforcing the HHS Mandate.

33. Defendant Kathleen Sebelius (herein "Sebelius") is the Secretary of the United States Department of Health and Human Services (herein "HHS").  In that capacity, she is responsible for the operation and management of HHS.  Sebelius is sued in her official capacity only.

34. HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

35. Defendant Seth D. Harris (herein "Harris") is the Acting Secretary of the United States Department of Labor (herein "DOL").  In that capacity, he is responsible for the operation and management of DOL.  Harris is sued in his official capacity only.

36. Defendant DOL is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

37. Defendant Neal Wolin (herein "Wolin") is the Acting Secretary of the United States Department of the Treasury (herein "Treasury").  In that capacity, he is responsible for the operation and management of Treasury.  Wolin is sued in his official capacity only.

38. Defendant Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

## JURISDICTION AND VENUE

39. This action arises under the Constitution and laws of the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361; jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65; and authority to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

40. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).  A substantial part of the events or omissions giving rise to this Verified Complaint occurred in this district and MR. Briscoe and Mr. Briscoe's Businesses are all domiciled and/or resident in this district.

## FACTUAL ALLEGATIONS

41. Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

I.     **Plaintiffs' Religious Beliefs**

42. Mr. Briscoe is a believing and practicing Evangelical Christian and believes that the Holy Bible is the inerrant Word of God.

43. As is set forth in Plaintiffs' Mission Statement (attached hereto as Exhibit B), Mr. Briscoe's Businesses are committed to "honor and love God by caring for people."

44. One of the religious and moral teachings which Mr. Briscoe embraces, based on the Holy Bible, is that a preborn child is, from the moment of conception, *i.e.*, a fertilized embryo, a human being created in the image of God.  See, e.g., Ps. 51:5; 139:13; Luke 1:41-44; 18:15; 2 Tim. 3:15.

45. Based on these religious and moral teachings, Mr. Briscoe sincerely believes that the termination of the life of a preborn child by, among other ways, abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling, is an intrinsic evil and a sin against God for which Mr. Briscoe will be held accountable.  Therefore, abortion and any abortifacient contraceptive drug or procedure that may terminate the life of a fertilized embryo is morally wrong and objectionable to Mr. Briscoe.

46. Mr. Briscoe, who owns and is solely responsible for the management of all of Mr. Briscoe's Businesses, seeks to conduct his business operations with integrity and in compliance with these pro-life beliefs.

47. Consequently, Mr. Briscoe believes that it would be immoral and sinful for Mr. Briscoe's Businesses to knowingly and intentionally participate in, pay for, facilitate, or otherwise support abortion-inducing contraception drugs, abortifacient drugs, and related education and

counseling, as is required by the HHS Mandate, through their inclusion in health insurance coverage offered by Plaintiffs to Plaintiffs' employees.

## II.       Plaintiffs' Health Insurance Plan

48. As part of fulfilling their organizational mission and Christian beliefs and commitments, Mr. Briscoe, through CHM, provides generous health insurance for their employees.

49. Mr. Briscoe's Businesses employ more than 200 full-time employees throughout its various locations, all of which are in the State of Colorado.  At present, 108 of these employees are health insurance plan participants, along with 89 of their dependents, resulting in 197 covered lives.

50. Plaintiffs maintain, through CHM, a self-insured group plan for their employees, in which CHM acts as its own insurer.

51. The plan year for CHM's self-insured plan begins on April 1 of each year, with the next plan year starting on April 1, 2013.

52. To implement the plan for the new year beginning April 1, 2013 and/or to make substantial plan changes as a result of the HHS Mandate, Plaintiffs must make insurance coverage decisions and logistical arrangements before or by February 15, 2013, in order for the plan to be arranged, reviewed, finalized, and offered to employees for open enrollment in time for the plan year's April 1, 2013 start date.

## III.      The PPACA and the HHS Mandate

53.  Under the PPACA, employers with over 50 full-time employees are required to provide a certain minimum level of health insurance to their employees.

54. Nearly all such plans must include "preventive services," *i.e.,* abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling which must be offered with no cost-sharing by the employee.

55. On February 10, 2012, the Department of Health and Human Services finalized a rule implementing the HHS Mandate that imposes a definition of preventive services to include all FDA-approved "contraceptive" drugs, surgical sterilization, and education and counseling for such services.

56. This final rule was adopted without giving due weight to the tens of thousands of public comments submitted to HHS in opposition to the HHS Mandate.

57. In the category of "FDA-approved contraceptives" included in this HHS Mandate are several drugs or devices that may cause the demise of an already-conceived but not-yet-implanted human embryo, such as "emergency contraception" or "Plan B" drugs (the so-called "morning after" pill).

58. The FDA approved in this same category a drug called "ella" (the so-called "week after" pill) which studies show can function to kill embryos even after they have implanted in the uterus, by a mechanism similar to the abortion drug RU-486.

59. The manufacturers of some such drugs, methods and devices in the category of "FDA-approved contraceptive methods" indicate that they can function to cause the demise of an early human embryo.

60. The HHS Mandate also requires group health care plans to pay for the provision of counseling, education, and other information concerning contraception (including devices and drugs such as Plan B and ella that cause early abortions or harm to human embryos) and sterilization for all women beneficiaries who are capable of bearing children.

61. The HHS Mandate applies to the first health insurance plan-year beginning after August 1, 2012.

62. An entity cannot escape the HHS Mandate by self-insuring; Plaintiffs' plan is thus subject to the HHS Mandate even though it is self-insured.

63. As Plaintiffs' self-insurance plan does not qualify for grandfathered status, Plaintiffs are, absent relief from this Court, subject to the HHS Mandate's requirement of coverage of the above-described items starting in Plaintiffs' April 1, 2013 plan.

64. The HHS Mandate makes little or no allowance for the religious freedom of individuals and the entities they own and operate, including Plaintiffs, who object to paying for or providing insurance coverage for such items.

65. An entity cannot freely avoid the HHS Mandate by simply refusing to provide health insurance to its employees, because the PPACA imposes monetary penalties on entities that would so refuse.

66. The exact magnitude of these penalties may vary according to the complicated provisions of the PPACA, but the fine is approximately $2,000 per employee per year.

67. PPACA also imposes monetary penalties if Plaintiffs were to continue to offer their self-insured plan but omitted abortifacients, contraceptives and sterilization.

68. The exact magnitude of these penalties may vary according to the complicated provisions of the PPACA, but the fine is approximately $100 per day per employee, with minimum amounts applying in different circumstances.

69. If Plaintiffs do not submit to the HHS Mandate they also trigger a range of enforcement mechanisms that exist under ERISA, including but not limited to civil actions by the Secretary of Labor or by plan participants and beneficiaries, which would include, but not be

limited to, relief in the form of judicial orders mandating that Plaintiffs violate their sincerely held religious beliefs and provide coverage for abortifacients to which they religiously object.

70. The HHS Mandate applies not only to sponsors of group health plans like Plaintiffs, but also to issuers of insurance. Accordingly, Plaintiffs cannot avoid the HHS Mandate by shopping for an insurance plan that accommodates their right of conscience, because the Administration has intentionally foreclosed that possibility.

71. The HHS Mandate offers the possibility of a narrow exemption to religious employers, but only if such religious employers meet all of the following requirements:

    (1) "The inculcation of religious values is the purpose of the organization;

    (2) The organization primarily employs persons who share the religious tenets of the organization;

    (3) "The organization serves primarily persons who share the religious tenets of the organization; and

    (4) The organization is a church, an integrated auxiliary of a church, a convention or association of churches, or is an exclusively religious activity of a religious order, under Internal Revenue Code 6033(a)(1) and (a)(3)(A)."

72. The HHS Mandate imposes no constraint on the government's discretion to grant exemptions to some, all, or none of the organizations meeting the HHS Mandate's definition of "religious employers."

73. Plaintiffs are not "religious" enough under this definition in several respects, including but not limited to because they have purposes other than the "inculcation of religious values," they do not primarily hire or serve Christians, and because Plaintiffs are not a church, integrated auxiliary of a particular church, convention or association of a church, or the exclusively religious activity of a religious order.

74. The HHS Mandate fails to protect the statutory and constitutional conscience rights of religious Americans like Plaintiffs even though those rights were repeatedly raised in the public comments.

75.  The HHS Mandate requires that Plaintiffs provide coverage for abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling related to the same, against their conscience and in violation of their religious beliefs, in a manner that is contrary to law.

76. The HHS Mandate constitutes government-imposed coercion on Plaintiffs to change or violate their sincerely held religious beliefs.

77. The HHS Mandate exposes Plaintiffs to substantial fines for refusal to change or violate their religious beliefs.

78. The HHS Mandate will impose a burden on the Plaintiffs' employee recruitment and retention efforts by creating uncertainty as to whether or on what terms they will be able to offer health insurance different from or beyond the HHS Mandate's effect or will suffer penalties therefrom.

79. The HHS Mandate will place Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees and students.

80. Plaintiffs have a sincere conscientious religious objection to providing coverage for abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling.

81. The HHS Mandate does not apply equally to all religious adherents or groups.

82. PPACA and the HHS Mandate are not generally applicable because they provide for numerous exemptions from their rules.

83. For instance, the HHS Mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds. See 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii).  Plaintiffs do not meet this exemption.

84. In addition, as described above, the HHS Mandate exempts certain churches narrowly considered to be religious employers.  Plaintiffs do not meet this exemption.

85. Furthermore, the PPACA creates a system of individualized exemptions because, under the PPACA's authorization, the federal government has granted discretionary compliance waivers to a variety of businesses, including large businesses, for purely secular or political reasons.  Plaintiffs have not been granted any such exemption.

86. The HHS Mandate does not apply to employers with preexisting plans that are "grandfathered."

87. Plaintiffs' plan is not grandfathered under PPACA, nor will its plan year that starts on April 1, 2013 have grandfathered status.

88. The HHS Mandate does not apply through the employer mandate to employers having fewer than 50 full-time employees.  Plaintiffs, having more than 50 full-time employees, do not meet this exemption.

89. President Obama held a press conference on February 10, 2012, and later (through Defendants) issued an "Advanced Notice of Proposed Rulemaking" ("ANPRM") on March 21, 2012 (77 Fed. Reg. 16501–08), claiming to offer a "compromise" under which some religious non-profit organizations not meeting the above definition would still have to comply with the HHS Mandate, but by means of the employer's insurer offering the employer's employees the same coverage for "free."

90. This "compromise" is not helpful to Plaintiffs because, among other reasons, Plaintiffs are not non-profit entities and Plaintiffs' plan is self-insured.

91.  The ANPRM is neither a rule, a proposed rule, nor the specification of what a rule proposed in the future would actually contain.  It in no way changes or alters the final status of the February 15, 2012 HHS Mandate.  It does not even create a legal requirement that Defendants change the HHS Mandate at some time in the future.

92. On February 10, 2012 a document was also issued from the Center for Consumer Information and Insurance Oversight (CCIIO), Centers for Medicare & Medicaid Services (CMS), of HHS, entitled "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code."

93. Under this "Guidance," an organization that truthfully declares "I certify that the organization is organized and operated as a non-profit entity; and that, at any point from February 10, 2012 onward, contraceptive coverage has not been provided by the plan, consistent with any applicable State law, because of the religious beliefs of the organization," and that provides a specified notice to plan participants, will not "be subject to any enforcement action by the Departments for failing to cover recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans established or maintained by an organization, including a group or association of employers within the meaning of section 3(5) of ERISA, (and any group health insurance coverage

provided in connection with such plans)," until "the first plan year that begins on or after August 1, 2013."

94. The "Guidance" categorically disqualifies Plaintiffs from making use of this "extra year" because, among other reasons, Plaintiffs are not non-profit entities.

95. Therefore while President Obama's "compromise" and guidance purport to accommodate the religious beliefs of even more groups beyond the HHS Mandate's initial exemption for churches, none of these measures will stop the HHS Mandate from imposing its requirements on Plaintiffs' plan year beginning April 1, 2013.

96. Unless relief issues from this Court, Plaintiffs are forced to take the HHS Mandate into account now and no later than February 15, 2013, as Plaintiffs plan expenditures, including employee compensation and benefits packages, for the April 1, 2013 plan year and thereafter. Additionally, Plaintiffs will have to negotiate contracts for new and existing employees and these contracts will extend into the time frame when the HHS Mandate begins to apply to Plaintiffs' health insurance plan.

97. The HHS Mandate will have a profound and adverse effect on Plaintiffs and how they negotiate contracts and compensate their employees.

98. The HHS Mandate will make it difficult for Plaintiffs to attract quality employees because of uncertainty about health insurance benefits.

99. Any alleged interest Defendants have in providing free FDA-approved abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling without cost-sharing could be advanced through other, more narrowly tailored mechanisms that do not burden the religious beliefs of Plaintiffs and do not require them to provide or facilitate coverage of such items through their health plan.

100.    Without injunctive and declaratory relief as requested herein, including preliminary

injunctive relief issued on or before February 15, 2013, Plaintiffs are suffering and will

continue to suffer irreparable harm.

101.    Plaintiffs have no adequate remedy at law.

### FIRST CLAIM FOR RELIEF
**(Violation of the Religious Freedom Restoration Act**
**42 U.S.C. § 2000bb)**

102.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

103.    Plaintiffs' sincerely held religious beliefs prohibit them from knowingly providing

coverage for abortion-inducing contraception drugs, abortifacient drugs, and related

education and counseling in their employee health insurance plan.

104.    When Plaintiffs comply with Christian ethical and moral teachings on abortion-inducing

contraception drugs, abortifacient drugs, and related education and counseling and with their

sincerely held religious beliefs, they exercise religion within the meaning of the Religious

Freedom Restoration Act.

105.    The HHS Mandate imposes a substantial burden on Plaintiffs' religious exercise and

coerces them to change or violate their sincerely held religious beliefs.

106.    The HHS Mandate chills Plaintiffs' religious exercise within the meaning of RFRA.

107.    The HHS Mandate exposes Plaintiffs to substantial fines and/or financial burdens for

their religious exercise.

108.    The HHS Mandate exposes Plaintiffs to substantial competitive disadvantages because of

uncertainties about their health insurance benefits caused by the HHS Mandate.

109.    The HHS Mandate furthers no compelling governmental interest and is not narrowly

tailored to any compelling governmental interest.

110.    The HHS Mandate is not the least restrictive means of furthering Defendants' stated

interests.

111.    The HHS Mandate violates RFRA.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

**SECOND CLAIM FOR RELIEF**
**(Violation of Free Exercise Clause of the First Amendment**
**to the United States Constitution)**

112.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

113.    Plaintiffs' sincerely held religious beliefs prohibit them from knowingly providing

coverage for abortion-inducing contraception drugs, abortifacient drugs, and related

education and counseling in their employee health insurance plan.

114.    When Plaintiffs comply with Christian ethical and moral teachings on abortifacients,

contraception, and sterilization and with their sincerely held religious beliefs, they exercise

religion within the meaning of the Free Exercise Clause.

115.    The HHS Mandate is not neutral and is not generally applicable.

116.    Defendants have created categorical exemptions and individualized exemptions to the

HHS Mandate.

117.    The HHS Mandate furthers no compelling governmental interest.

118.    The HHS Mandate is not the least restrictive means of furthering Defendants' stated

interests.

119.    The HHS Mandate coerces Plaintiffs to change or violate their sincerely held religious

beliefs.

120.    The HHS Mandate chills Plaintiffs' religious exercise.

121.    The HHS Mandate exposes Plaintiffs to substantial fines and/or financial burdens for their religious exercise.

122.    The HHS Mandate exposes Plaintiffs to substantial competitive disadvantages because of uncertainties about its health insurance benefits caused by the HHS Mandate.

123.    The HHS Mandate imposes a substantial burden on Plaintiffs' religious exercise.

124.    The HHS Mandate is not narrowly tailored to any compelling governmental interest.

125.    By design, Defendants framed the HHS Mandate to apply to some religious Americans but not to others, resulting in discrimination among religions.

126.    Defendants have created exemptions to the HHS Mandate for some religious believers but not others based on characteristics of their beliefs and their religious exercise.

127.    Defendants designed the HHS Mandate, the religious exemption thereto, and the "compromise" and guidance allowances thereto, in a way that makes it impossible for Plaintiffs and other similar religious Americans to comply with their sincerely held religious beliefs.

128.     Defendants promulgated both the HHS Mandate and the religious exemption/allowances with the purpose and intent to suppress the religious exercise of Plaintiffs and others.

129.    The HHS Mandate violates Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

        WHEREFORE, the Plaintiffs pray for the relief set forth below.

### THIRD CLAIM FOR RELIEF
**(Violation of the Establishment Clause of the
First Amendment to the United States Constitution)**

130.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

131.    The First Amendment's Establishment Clause prohibits the establishment of any religion and/or excessive government entanglement with religion.

132.    To determine whether religious persons or entities like Plaintiffs are required to comply with the HHS Mandate, are required to continue to comply with the HHS Mandate, are eligible for an exemption or other accommodations, or continue to be eligible for the same, Defendants must examine the religious beliefs and doctrinal teachings of persons or entities like Plaintiffs.

133.    Obtaining sufficient information for the Defendants to analyze the content of Plaintiffs' sincerely held religious beliefs requires ongoing, comprehensive government surveillance that impermissibly entangles Defendants with religion.

134.    The HHS Mandate discriminates among religions and among denominations, favoring some over others, and exhibits a hostility to religious beliefs.

135.    The HHS Mandate adopts a particular theological view of what is acceptable moral complicity in provision of abortifacient, contraceptive and sterilization coverage and imposes it upon all religionists who must either conform their consciences to the HHS Mandate or suffer the penalties.

136.    The HHS Mandate violates Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## FOURTH CLAIM FOR RELIEF
### (Violation of the Free Speech Clause of the First Amendment to the United States Constitution)

137.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

138.    Defendants' requirement of knowingly providing insurance coverage for abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling forces Plaintiffs to speak in a manner contrary to their religious beliefs.

139.    Defendants have no narrowly tailored compelling interest to justify this compelled speech.

140.    The HHS Mandate violates Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

**FIFTH CLAIM FOR RELIEF**
**(Violation of the Due Process Clause of the**
**Fifth Amendment to the United States Constitution)**

141.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

142.    Because the HHS Mandate sweepingly infringes upon religious exercise and speech rights that are constitutionally protected, it is unconstitutionally vague and overbroad in violation of the due process rights of Plaintiffs and other parties not before the Court.

143.    Persons of common intelligence must necessarily guess at the meaning, scope, and application of the HHS Mandate and its exemptions.

144.    This HHS Mandate lends itself to discriminatory enforcement by government officials in an arbitrary and capricious manner.

145.    The HHS Mandate vests Defendants with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting whatever definition of "religious employers" it decides to craft.

146.    This HHS Mandate is an unconstitutional violation of Plaintiffs' due process rights under the Fifth Amendment to the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## SIXTH CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act)

147.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

148.    Because they did not give proper notice and an opportunity for public comment, Defendants did not take into account the full implications of the regulations by completing a meaningful consideration of the relevant matter presented.

149.    Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

150.    Therefore, Defendants have taken agency action not in accordance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

151.    In promulgating the HHS Mandate, Defendants failed to consider the constitutional and statutory implications of the HHS Mandate on Plaintiffs and similar persons.

152.    Defendants' explanation (and lack thereof) for its decision not to exempt Plaintiffs and similarly situated religionists and their entities from the HHS Mandate runs counter to the evidence submitted by religious Americans during the comment period.

153.    Thus, Defendants' issuance of the HHS Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the HHS Mandate fails to consider the full extent of its implications and it does not take into consideration the evidence against it.

154.    As set forth above, the HHS Mandate violates RFRA and the First and Fifth Amendments to the United States Constitution.

155.    The HHS Mandate is also contrary to the provisions of the PPACA which state that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide

coverage of [abortion] services . . . as part of its essential health benefits for any plan year." Section 1303(b)(1)(A).  As is described in detail above, some of the drugs included as "FDA-approved contraceptives" under the HHS Mandate cause abortions by causing the demise of human embryos before and/or after implantation.

156.    The HHS Mandate is also contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), which provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

157.    The HHS Mandate also violates the provisions of the Church Amendment, 42 U.S.C. § 300a-7(d), which provides that "No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

158.    The HHS Mandate is contrary to existing law and is in violation of the APA under 5 U.S.C. § 706(2)(A)f.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.      That this Court enter a judgment declaring the HHS Mandate and its application to Plaintiffs and others similarly situated but not before the Court to be an unconstitutional violation of their rights protected by RFRA, the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Administrative Procedure Act, and therefore invalid in any way applicable to them;

B.      That this Court enter a preliminary and a permanent injunction prohibiting Defendants from applying the HHS Mandate to Plaintiffs and others similarly situated but not before the Court in a way that substantially burdens the religious beliefs of Plaintiffs or any other person in violation of RFRA and the Constitution, and prohibiting Defendants from continuing to illegally discriminate against Plaintiffs and others not before the Court by requiring them to provide health insurance coverage for abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling to their employees;

C.      That this Court award Plaintiffs their court costs and reasonable attorney's fees, as provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. § 1988);

D.      That this Court grant such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury on all issues so triable.

Respectfully submitted this 4th day of February, 2013.

**_Attorneys for Plaintiffs_**:

    s/ Natalie L. Decker
Natalie L. Decker
The Law Office of Natalie L. Decker, LLC
26 W. Dry Creek Cr., Suite 600
Littleton, CO 80120
(O) 303-730-3009
(F) 303-484-5631
natalie@denverlawsolutions.com

and

    _s/ Michael J. Norton_
Michael J. Norton
ALLIANCE DEFENDING FREEDOM
7951 E. Maplewood Avenue, Suite 100
Greenwood Village, CO 80111
(O) 720-689-2410
(F) 303-694-0703
mjnorton@alliancedefendingfreedom.org

Steven H. Aden
Matthew S. Bowman
M. Casey Mattox
Catherine Glenn Foster
Alliance Defending Freedom
801 G Street, NW, Suite 509
Washington, DC 20001
Tel.: 202-393-8690
Fax: 202-347-3622
saden@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org
cmattox@alliancedefendingfreedom.org
cfoster@alliancedefendingfreedom.org

## VERIFICATION OF VERIFIED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint

are true and correct.

Executed on this 4th day of February, 2013.


_____ *s/ Stephen W. Briscoe*_____
STEPHEN W. BRISCOE


State of Colorado        )
                         ) ss.
County of Arapahoe   )

Acknowledged, subscribed, and sworn to before me by Stephen W. Briscoe this 4th day of February, 2013.

Witness my hand and seal.

My commission expires: 1/22/2017.


*s/Marilyn Kuipers*
Notary Public